# EXHIBIT A

## LEAD GENERATION AGREEMENT

This LEAD GENERATION AGREEMENT ("**Agreement**") is made as of  8/22/24  ("**Effective Date**"), by and between Happy Quote LLC, a Missouri company ("**Happy Quote**") and  Quest Health Solutions  ("**Client**").  Client and Happy Quote may be referred to herein in the singular as "**Party**" or jointly as "**Parties**".

## RECITALS

WHEREAS, Happy Quote is a company specializing in lead generation

WHEREAS, Client desires to purchase leads for various products and services

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, it is agreed:

## ARTICLE 1 – KEY DEFINITIONS

1.1   Definitions.  The Parties hereby agree that capitalized terms used in this Agreement, unless otherwise defined herein or in a particular Exhibit or Schedule, shall have the meanings assigned below:

"**Business Day**" means a day that is not a Saturday, a Sunday or a statutory or civic holiday in the State of California or any other day on which banking institutions are permitted or required to be closed in the State of California.

"**Force Majeure Event**" includes acts of God such as storms, fires, floods, lightning and earthquakes, war, riot, acts of a public enemy or other civil disturbance, or a strike, walkout, lockout or other significant labor dispute, deterioration of the financing markets or other causes beyond the affected Party's reasonable control.

"**Law**" means any applicable constitution charter, act, statute, law, case law, regulation, ordinance or code.

"**Lead**" means the contact details and related information for a potential customer delivered by Happy Quote to Client.

"**Person**" means any individual, corporation, partnership, joint venture, trust, unincorporated organization, association or Governmental Authority.

"**Qualified Lead**" means the contact details and related information for a potential customer who meets the minimum criteria set forth in Exhibit A.

"**Subcontractor**" shall mean a person or entity of any tier directly or indirectly engaged by Happy Quote regarding the performance or provision of the Services or the fulfillment, in whole or in part, of any obligation undertaken by Happy Quote in connection with this Agreement.

## ARTICLE 2– RELATIONSHIP

2.1     Happy Quote Activities.  Happy Quote shall deliver Qualified Leads to Client.

2.2     Exclusivity. Unless otherwise agreed, the Leads are exclusive to Client, and may not be provided to any other Person or Entity.

2.3     Status of Happy Quote.  The Parties acknowledge that Happy Quote shall perform its obligations under this Agreement and act at all times as an independent contractor and nothing in this Agreement shall be interpreted or applied so as to make the relationship of any of the Parties that of partners, joint ventures or anything other than independent contractors, and the Parties expressly disclaim any intention to create a partnership, joint venture, association or other such relationship.  Neither Party is granted any right (except as expressly provided herein) on behalf of the other Party to assume or create any obligation or responsibility binding such other Party.  None of Happy Quote's employees, Subcontractors or any such Subcontractor's employees shall be or shall be considered to be employees of Client.  Happy Quote shall be solely and fully responsible for the payment of all wages, salaries, benefits and other compensation to its employees and all amounts due and owing to Subcontractors.

## ARTICLE 3– RESPONSIBILITIES

3.1     Client Responsibilities.  Client agrees, at its own expense, to:

(a)     Pay Lead Fees in accordance with Exhibit B;

(b)     Act in a manner consistent with all applicable Laws in performing under this agreement; and

(c)     Provide Happy Quote with data regarding the performance of Happy Quote Leads including Cost Per Acquisition in a timely manner upon request

3.2     Happy Quote Responsibilities.  Happy Quote agrees to:

(a)     avoid deceptive, misleading or unethical representations or practices in performing the Services or any other obligation under this Agreement;

(b)     comply with all applicable Laws, including the Telephone Consumer Protection Act, 42 USC 227 and 47 CFR 64.200 and Do Not Call List requirements

## ARTICLE 4– LEADS

4.1     Lead Submission.  Happy Quote shall submit Qualified Lead to Client. All Qualified Leads shall be submitted by Happy Quote to Client via a method mutually agreed upon between Happy Quote and Client.

  4.2  <u>Lead Fulfillment</u>.

    (a)  Client shall be responsible, by itself or through any Person acting on its behalf as it may designate, to fulfill all Approved Leads by Client, in accordance with the applicable Agreement(s) resulting from such Leads. Happy Quote shall have no liability in relation to the fulfillment and execution of such Agreements.

    (b)  Client shall be responsible for all contact with a potential customer from the date that Happy Quote has submitted a Lead to Client.

### ARTICLE 5– CONFIDENTIALITY; INTELLECTUAL PROPERTY

  5.1  <u>Confidentiality</u>. Each Party agrees, and shall cause its respective directors, officers, employees, consultants, subcontractors, advisors and affiliates, to each treat and hold as confidential (and not disclose or provide access to any person, except on a need-to-know basis in order to carry out the business relationship contemplated hereunder) all business, technical, financial or other information of the other disclosing Party ("**Confidential Information**") including, without limitation, information relating to trade secrets, patent applications, product development, customer lists, pricing and marketing plans, policies and strategies, details of client and consultant contracts, business acquisition plans, list of zip codes serviced by Client, market entry information and new personnel acquisition plans. Each Party further agrees to use the Confidential Information of the other Party solely for the purpose of advancing the business relationship contemplated under this Agreement and otherwise as expressly permitted or directed by the disclosing Party, and each Party further agrees not to reverse engineer such Confidential Information. Notwithstanding the foregoing, each Party may make disclosures required by law or court order, provided that it provides the other Party with reasonable prior written notice and reasonable assistance in seeking a protective order and/or other limits on disclosure of its Confidential Information.

### ARTICLE 6 – FORCE MAJEURE

  6.1  <u>Force Majeure</u>. Each Party shall be excused from performance and shall not be considered to be in default with respect to any obligation hereunder, except for Client's obligation to pay money in a timely manner for Services actually performed by Happy Quote, if and to the extent that its failure of, or delay in, performance is due to a Force Majeure Event.

### ARTICLE 7 – INDEMNIFICATION

  7.1  <u>Client Indemnity</u>. Happy Quote will hold harmless, indemnify and defend Client, its affiliates, and its other contractors and agents, as well as the directors, officers and employees of each, against all claims and will pay all costs, damages and reasonable attorneys' fees paid or payable to unaffiliated third parties, arising directly or indirectly out of or resulting from: (i) any negligent, reckless, or intentionally wrongful acts or omissions on the part of Happy Quote; (ii) any acts, statements, claims, representations or warranties made by Happy Quote about Client or the products offered by Client; and (iii) any failure of Happy Quote to perform its obligations, or its failure to perform its obligations under this Agreement. This indemnification obligation shall apply regardless of the amount of insurance coverage held by Client, but will not exceed the net revenue collected by Happy Quote from Client under this contract. However, this obligation will only apply when Client delivers timely notice to Happy Quote of an event that would lead to an indemnification obligation, thereby giving Happy Quote adequate time to cure the event Client shall be entitled to offset any amounts owed pursuant to this Section from unpaid or future Lead Fees

       7.2       <u>Happy Quote Indemnity</u>. Client will hold harmless, indemnify and defend Happy Quote and their directors, officers and employees against all third party claims and will pay all costs, damages and reasonable attorneys' fees paid or payable to unaffiliated third parties, arising directly or indirectly out of or resulting from: (i) any negligent, reckless, or intentionally wrongful acts or omissions on the part of Client, its agents, or any person or entity acting on Client's behalf; and (ii) any failure of Client to perform its obligations under this Agreement in accordance with all applicable Laws, rules and regulations. This indemnification and defense obligation shall apply regardless of the amount of insurance coverage held by Happy Quote.

       7.3       <u>TCPA</u> and similar laws require that (a) prior express written consent be obtained before (i) telephone calls and text messages can be placed to any wireless telephone number using an automatic telephone dialing system and (ii) telephone calls can be placed to any telephone number, including a residential line, which call includes or introduces an advertisement or constitutes telemarketing using an artificial or prerecorded voice, and (b) evidence of such consent must be recorded. Certain state laws prohibit the use of an auto dialer or automated system (used for the selection or dialing of telephone numbers or the playing of a recorded message) unless: (i) a live message is left and the messages are solely in response to calls initiated by the person the auto dialer was used to call, (ii) the telephone number(s) selected have been screened to exclude subscribers of the current federal and state Do Not Call lists, or (iii) the call is made concerning goods or services that have been previously ordered or purchased. The FTC's Telemarketing Sale Rule requires that telephone calls (including text messages) placed to any telephone number, including a residential landline, using a prerecorded voice must have previously obtained the recipient's signed written agreement. Such written agreement may be obtained for prerecorded sales messages in any manner permitted by the Electronic Signatures In Global and National Commerce Act (E-SIGN Act). Publisher accordingly acknowledges and covenants that it will: (A) obtain the prior express written consent of consumers for all Lead/Call Requests and Lead and Call Transfers generated hereunder to (1) receive calls and/or text messages from Company or Company's third party marketers, as applicable, placed to a telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service or other radio common carrier service, or any service for which the called party is charged for the call, using an automatic telephone dialing system or an artificial or prerecorded voice, and (2) receive telephone calls from Company or Company's third party marketers, as applicable, to residential lines using an artificial or prerecorded voice, and (3) record said consents if verbal, and (4) maintain said consents if written, and (5) comply with all other requirements of the TCPA. The record of "prior express written consent" shall include, at a minimum, the name, date, time, IP address and referral URL where the applicable consumer(s) submitted the Lead/Call Request, as well as the telephone call recording associated with the Lead and/or Call Transfer, and a third-party certificate from Active Prospect ("Trusted Form") or other third-party as Company may specify. Publisher shall retain the records of each individual's "prior express written consent" ("Consent Records") for a minimum of five (5) years following creation of same, and shall provide such Consent Records to Company within two (2) business days of a request for the same. If Publisher uses any third parties whatsoever to create, receive, maintain, transmit and/or otherwise assist or perform obligations on behalf of Publisher with respect to providing Leads, Call Transfers and/or any other service relating to these Terms, Publisher shall require such third party to agree, in writing, to comply with the requirements of the TCPA and all restrictions and conditions to which Publisher is bound in these Terms and Publisher shall be fully liable for any violations by such third parties

7.4     Obligations of Indemnifying Party.  If an indemnified Party determines that it is entitled to indemnification under this ARTICLE 7, such indemnified Party shall promptly notify the indemnifying Party in writing of the applicable loss and/or claim, and provide all reasonably necessary or useful information, and assistance in the settlement and/or defense of any such claim and/or loss.  The selection of counsel, the conduct of the defense of any lawsuit, arbitration, or other proceeding, and any settlement shall solely be within the indemnifying Party's control, provided that the indemnified Party shall have the right to participate in the defense of such loss and/or claim using counsel of its choice, at its expense.  No settlement that would directly (and not only through this ARTICLE 7) impose any costs or liability upon the indemnified Party shall be made without such Party's prior written consent.

### ARTICLE 8– LIMITATION OF LIABILITY

8.1     No Consequential Damages.  EXCEPT FOR THE INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT OR CONFIDENTIALITY PROVISIONS HEREIN, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY LOST PROFITS OR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF THE CAUSE OF ACTION (INCLUDING NEGLIGENCE), EVEN IF THE OTHER PARTY HAS BEEN INFORMED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.

8.2     Liability Cap.  EXCEPT FOR THE INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT AND THE BREACH OF CONFIDENTIALITY, IN NO EVENT WILL EITHER PARTY'S LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT EXCEED THE SUM OF AMOUNTS PAID AND PAYABLE TO EITHER PARTY UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LEAD FEES PAID AND PAYABLE UNDER THIS AGREEMENT.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, CLIENT HEREBY SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, REGARDING THE CLIENT PRODUCTS, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY, TITLE OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.

### ARTICLE 9 – DISPUTE RESOLUTION

9.1     Negotiation.  Except with respect to injunctive or other equitable relief, which may be sought immediately in any court of competent jurisdiction, the Parties shall negotiate in good faith and attempt to resolve any good faith dispute within thirty (30) days after the date that a Party gives written notice of such dispute to the other Party.  In the event that the Parties are unable to reach an agreement within such thirty (30) day period (or such longer period as the Parties may agree in writing) then either Party may initiate mediation.  In such mediation, representatives of the Parties with authority to resolve the dispute shall meet for at least three (3) hours with a mediator whom they choose together.  If the

Parties are unable to agree on a mediator, then either Party is hereby empowered to request JAMS ("**JAMS**") to appoint a mediator. The mediator's fee and expenses shall be paid one-half by each Party.

      9.2     <u>Arbitration</u>. Except with respect to injunctive or other equitable relief, which may be sought immediately in any court of competent jurisdiction, any dispute arising out of this Agreement and not resolved in accordance with the above shall be submitted to an arbitrator in a mutually agreeable location in Sheridan, Wyoming. Attendance may be in-person, or via video conferencing technology. The arbitrator shall be mutually selected by the Parties to conduct a binding arbitration. If the Parties cannot mutually agree on the arbitrator within sixty (60) days of written demand for arbitration, then either of the Parties may submit the dispute to JAMS for arbitration according to Comprehensive Arbitration Rules and Procedures of JAMS, and JAMS shall administer the binding arbitration. The arbiter may assign payment of arbitration fees to either Party or both Parties. Judgment upon the award may be entered in any court having jurisdiction thereof. The arbitrator's award shall be detailed and set forth both the legal and factual basis of the award. This agreement to arbitrate will be specifically enforceable by any court with jurisdiction thereof.

## ARTICLE 10– TERM; TERMINATION

      10.1    <u>Term</u>. The initial term of this Agreement commences as of the Effective Date and expires one (1) year after the Effective Date, this Agreement shall automatically renew for consecutive additional one (1) year terms (collectively with the initial term, the "**Term**"), <u>provided</u>, <u>however</u>, no such renewal shall occur if either Party delivers the other Party a non-renewal notice at least thirty (30) days before the expiration of the then-current Term.

      10.2    <u>Termination</u>. This Agreement may be terminated:

          (a)    at any time by either Party for cause in the event of any material breach or default by the other Party that is not cured within three days (3 days following written notice thereof by the non-breaching or non-defaulting Party);

          (b)    at any time by either Party in the event that bankruptcy or insolvency proceedings are instituted by, on behalf of, or against the other Party, provided that such proceedings are not dismissed within 90 days of institution;

          (c)    at any time by either party upon 14 days written notice; or

          (d)    at any time upon mutual written agreement of both Parties.

      10.3    Effect of Termination. Subject to <u>Section 11.4</u>, upon expiration or termination for any reason, the Agreement will cease to be in effect and none of the Parties will have any further obligation or liability to the other.

      10.4    Survival. The Parties' rights and obligations under Sections 2.3, 5.1 and 10.3, 11.4 and, ARTICLE 8, ARTICLE 9 and ARTICLE 11, as well as any payment obligations in Exhibit A, Exhibit B and other Insertion Orders accrued prior to termination, will survive any termination or expiration of this Agreement.

## ARTICLE 11 – MISCELLANEOUS PROVISIONS

      11.1    <u>Assignment and amendments</u>.  Neither Happy Quote nor Client may assign or transfer this Agreement or its rights or obligations hereunder, in whole or in part, without the written consent of the non-assigning party, which consent shall not be unreasonably withheld, conditioned, or delayed. Any assignment or transfer purported to be made without such written consent having been provided shall be null and void.  E<u>x</u>cept as otherwise set forth herein, no change, amendment or modification of this Agreement shall be valid or binding upon the Parties hereto unless such change, amendment, or modification shall be in writing and duly executed by both Parties.

      11.2    <u>No Waiver</u>.  Any failure of Client or Happy Quote to enforce any of the provisions of this Agreement or to require at any time performance by Happy Quote or Client of any of the provisions hereof during the pendency of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of Client or Happy Quote thereafter to enforce any and each such provision.

      11.3    <u>Applicable Law</u>.  This Agreement shall be governed by, construed and enforced in accordance with the Laws of the State of Wyoming, without regard to any conflicts of laws or provisions thereof.

      11.4    <u>Entire Agreement</u>.  This Agreement along with the attached exhibits and subsequent insertion orders (which are incorporated into this Agreement by this reference and deemed to be an integral part of this Agreement) and any confidentiality and nondisclosure agreement between the Parties ("NDA") contain the entire understanding of the Parties with respect to the subject matter hereof and supersedes any and all prior negotiations, contracts, agreements, commitments, and writings with respect thereto.  There are no oral understandings, terms or conditions and neither Party has relied upon any representation, express or implied, not contained in this Agreement or the NDA.

      11.5    <u>Notice</u>.  All written documentation or notices may be transmitted via U.S. Post, private express mail service, electronic mail, or facsimile.  Digital photographs may be transmitted via email or text message from a hand-held mobile device, to the following addresses:

**If to Client:**

| | |
|---|---|
| Client name: | Quest Health Solutions |
| Attn: | Adam Nadler |
| Address: | 7401 Wiles Road Suite 139 |
| City, State, Zip: | Coral Springs, FL 33067 |
| Email: | adam@questhealthsolutions.com |

**If to Happy Quote:**

        Happy Quote LLC

| Attn: | Ali Agha |
|---|---|
| Address: | 117 Lexington St, Ste 100, Harrisonville, MO 64701 |
| Email: | ali.agha@happyquote.io |
| Email CC | rida.ajaz@ happyquote.io |

11.6    <u>Severability</u>.  If any term or provision of this Agreement is determined to be invalid, in conflict with any Law, void, or otherwise unenforceable, and provided the terms and provisions of the Agreement that are essential to the interests of Client and Happy Quote remain substantially in effect, then the remaining terms and provisions will continue in full force and effect.

11.7    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which taken together will constitute but one and the same instrument.

IN WITNESS WHEREOF, the Parties have hereto set their hands as of the Effective Date.

**HAPPY QUOTE LLC**                                    **CLIENT:**

| | | | | |
|---|---|---|---|---|
| By: | *Ali Agha* (DocuSigned by, EF39E1D5F0894C0...) | | By: | *Adam Nadler* (Signed by, CD415C9B2E554B5...) |
| Name: | Ali Agha | | Name: | Adam Nadler |
| Title: | Managing Partner | | Title: | CEO |

## EXHIBIT A – Lead Qualification

**Approved Lead Requirements**: Client has the right to reject any Lead pursuant to Section 4.2 of the Agreement if such Lead does not meet the following requirements or as otherwise set forth in Section 4.2 of the Agreement:

    To be determined in subsequent Insertion Orders

**Unqualified Leads:** If Happy Quote submits leads to Client that Client believes do not meet the approved leads qualification criteria, Client will send such leads along with their grounds for rejection to Happy Quote. These proposed rejections will be processed on weekly basis and must be submitted no later than 2 days after the close of the calendar week.

| HAPPY QUOTE LLC | | Client: | |
|---|---|---|---|
| By: | *Ali Agha* (DocuSigned) EF39E1D5F0894C0... | By: | *Adam Nadler* (Signed) CD415C9B2E554B5... |
| Name: | Ali Agha | Name: | Adam Nadler |
| Title: | Managing Partner | Title: | CEO |
| Date: | 08/21/2024 | Date: | 08/22/24 |

## EXHIBIT B – Compensation and Payment Terms

**Compensation:** To be determined in subsequent Insertion Order. Happy Quote maintains the right to adjust pricing on a go-forward basis with 7 days written notification.

**Timing:** To be determined in subsequent Insertion Order.

**Payment Method:** Client shall pay via same day ACH or wire transfer.

**Unqualified lead refunds:** Happy Quote and Client will confirm which leads did not meet the minimum requirements set forth in exhibit A. At Client's sole discretion, Happy Quote will subtract these rejected leads from its next invoice or will credit the rejected leads against the following week's approved leads.

| HAPPY QUOTE LLC | | Client: | |
|---|---|---|---|
| By: | *Ali Agha* (DocuSigned by, EF39E1D5F0894C0...) | By: | *Adam Nadler* (Signed by, CD415C9B2E554B5...) |
| Name: | Ali Agha | Name: | Adam Nadler |
| Title: | Managing Partner | Title: | CEO |
| Date: | 08/21/2024 | Date: | 8.22.24 |