**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JESSICA MURCH, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br>   v.<br><br><br>QUEST HEALTH SOLUTIONS, LLC<br><br>AND<br><br>HAPPY QUOTE LLC<br><br>            Defendants. | Case No.<br>2:24-cv-05478-GAW |

**Plaintiff's Response in Opposition To Defendant**
**Quest Health Solutions, LLC's Motion to Dismiss**

i

## I.    INTRODUCTION

Defendant Quest Health Solutions, LLC's (Quest Health or Defendant)'s motion to dismiss must fail because the Plaintiff has pled sufficient facts to demonstrate the exercise of specific personal jurisdiction in Pennsylvania against Quest Health. Even though co-Defendant Happy Quote LLC initiated the calls at issue, which it then transferred exclusively to Quest Health, the fact remains that the illegal prerecorded telemarketing calls were sent to a Pennsylvania telephone number with an area code in this district and were made for Quest Health's benefit, including because the Quest Health representative with whom the Plaintiff spoke *specifically asked* the Plaintiff if she was in Pennsylvania, and thereafter transferred the call to another Quest Health representative in its shipping department.

The jurisdictional allegations here are of the same type that Courts routinely held are sufficient in cases of telemarketing conduct like that alleged here. In arriving at that fact, Quest Health performs its core business, that of selling diabetic medical equipment, to individuals in Pennsylvania. And the conduct alleged here–marketing for those very same goods and services– indisputably was aimed at Pennsylvania, including because (1) the calls were placed to a Pennsylvania telephone number, (2) with "spoofed" Pennsylvania caller IDs, and (3) with Quest Health agents who asked if the Plaintiff was in Pennsylvania and then transferred the call to Quest Health's shipping department. Moreover, publicly available LinkedIn data reveals that Quest Health employs at least two Pennsylvania residents in a sales-related capacity in Pennsylvania, including its Vice President of Sales. Courts across the country, including this one, have held sufficient such allegations in permitting the exercise of specific personal jurisdiction against the caller and ultimate seller of goods via telephone. This Court should reject Defendant's general denial of liability couched as an attack on personal jurisdiction.

## II.    LEGAL STANDARD

The standard for a motion to dismiss under Rule 12(b)(2) is well-established before this Court. In ruling on a Rule 12(b)(2) motion, the court must accept the allegations in the complaint as true and draw all reasonable inferences supported by the well pleaded factual allegations in the plaintiff's favour. *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 151 (3d Cir. 1992). However, a Rule 12(b)(2) challenge is unique in that it is not limited to the four corners of the pleading and the Court may consider additional evidence proffered by both parties, including affidavits, evidence, and judicially noticeable records. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003). And although the plaintiff will ultimately bear the burden of demonstrating personal jurisdiction at trial, he need not make such a showing at the pleadings stage. *Id.* Rather, the Plaintiff must merely allege sufficient facts to establish a *prima facie* case of jurisdiction over the defendant and is entitled to a reduced standard when that defendant is a corporation, as here. *Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983) ("A plaintiff who is a total stranger to a corporation should not be required, unless he has been undiligent, to try such an issue on affidavits without the benefit of a full discovery."). And, when claims of jurisdiction are the subject of a good faith dispute, the court must generally permit jurisdictional discovery. *Rocke v. Pebble Beach Co.*, 541 F. App'x 208, 212 (3d Cir. 2013) (citing *Toys "R" Us*, 318 F. 3d at 456).

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it

2

rests." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (cleaned up). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Connelly*, 809 F.3d at 786–87. After identifying elements to set forth a claim and removing conclusory allegations, the Court must accept all well-pled factual allegations as true and determine if they give rise to relief. *Id.* A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because the defendant proffers some contrary facts. *Twombly*, 550 U.S. at 570.

### III.   ARGUMENT

A.   *The Plaintiff has unquestionably pled sufficient facts to justify the exercise of specific personal jurisdiction against Quest Health in Pennsylvania based on calls she received to her phone number in a Pennsylvania area code from a Pennsylvania caller ID, which resulted in a call transfer to a Quest Health representative who asked her if she was in Pennsylvania. Discovery must resolve any ancillary questions intertwined with the merits.*

Defendant Quest Health, in essence, adopts in its motion the classic "I didn't do it" defense, but styles it instead as an attack on this Court's exercise of personal jurisdiction over the Defendant because Quest Health did not physically initiate the telemarketing call at issue, but rather because co-Defendant Happy Quote did. But such doubt as to liability is more properly the subject of a jury trial or at the very least a motion for summary judgment. Notwithstanding the fact that the calls Plaintiff is alleged to have received (1) were sent using "spoofed" 215- area code telephone numbers, (2) to a Pennsylvania area code, (3) during which Plaintiff spoke with a Quest Health agent who asked the Plaintiff on their own accord if she was in Pennsylvania on the

call, and (4) then transferred the call to its shipping department, Quest Health claims that it is not subject to specific personal jurisdiction here. This argument lacks any merit and must be denied.

As a preliminary matter, courts in the Third Circuit have expressed extreme skepticism at Rule 12(b)(2) TCPA challenges based on purported denials of liability at the pleadings stage, such as based on whether companies are *alter egoes* of each other, or, as here, dispute what company committed the allegedly tortious conduct. *See, e.g.*, *Newell v. Strategic Admin. Grp., Inc.*, No. 2:20-CV-00967-JDW, 2020 WL 12770854, at *1 (E.D. Pa. May 6, 2020); *Abramson v. Agentra, LLC*, Civ. A. No. 18-615, 2018 WL 6617819, at * 4 (W.D. Pa. Dec. 18, 2018); *Wick v. Twilio Inc.*, No. C16-00914RSL, 2017 WL 2964855, at *4 (W.D. Wash. July 12, 2017) (allowing claim against call vendor to proceed when third party initiated the call at issue). If anything, those facts, including whether there is a case for direct or vicarious liability, ought to be sorted out in discovery. Indeed, as Judge Wolson eloquently observed in *Newell* in rejecting an argument nearly identical to that here that a third party placing the call divested it of jurisdiction, "Because the TCPA could impose vicarious liability on SAG for a call made to Pennsylvania, SAG has the requisite minimum contacts with Pennsylvania to give rise to personal jurisdiction." *Id.* at *2 (citing *Abramson*). And, cutting to the heart of Quest Health's argument, the Court observed:

> The Court also concludes that the maintenance of the suit in Pennsylvania does not offend traditional notions of fair play. SAG authorized a vendor to sell its policies without geographic restriction. It was foreseeable that SAG's calls might violate the TCPA in any jurisdiction to which a call was placed. Moreover, the relative burdens of litigating favor forcing a company that makes a call to litigate in the district where the call was made, rather than forcing the consumer that receives the call to litigate in the district where the seller happens to reside.

*Id.*

In cases where jurisdictional questions are enmeshed with factual questions going to the merits of the case, a court may hold an evidentiary hearing on those matters or defer a

determination on those jurisdictional issues until trial, for otherwise it will be impossible for the Court to decide one (i.e. the jurisdictional issue) without the other (i.e. the factual issue). *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 94 (3d Cir. 2004). Moreover, the Thid Circuit has enforced the imputation of jurisdictional contacts on foreign defendants, as here, even in the absence of a partnership or other formal legal relationship, based upon the conspiracy theory of personal jurisdiction and related theories, such as various liability. *Id.* at 102 n.8.

This Court should do likewise. At this point, it would be unjust for the Court to conclude that it does not have specific personal jurisdiction over Quest Health, especially on the facts alleged here, as well as the relationship as between Quest Health and Happy Quote, namely the following: (1) the calls Plaintiff received were sent using "spoofed" 215- area code numbers, demonstrating express aiming into Pennsylvania by the very numbers that Happy Quote used (Am. Compl. ¶ 27); (2) the Plaintiff received calls to her 215- area code North Wales number (Am. Compl. ¶ 9, 20); (3) the calls the Plaintiff received were made to sell Quest's products, including by a Quest Health agent who asked the Plaintiff if she was in Pennsylvania (Compl. ¶ 30–33, Murch Dec.); (4) the Plaintiff was then transferred to Quest Health's shipping department, where the Quest Health agent was able and willing to ship the advertised diabetic supplies into Pennsylvania (Compl. ¶ 33). These facts show at the very least that the Plaintiff has pled facts which can give rise to at the least vicarious liability. *Newell*, 2020 WL 12770854 at *2.

Moreover, Defendant Quest Health's faulty argument that this Court cannot find agency because the calls at issue were allegedly placed through another third party have likewise also already been rejected by this Court multiple times. *Perrong v. Chase Data Corp.*, No. CV 22-2628, 2024 WL 329933, at *2 n.1 (E.D. Pa. Jan. 26, 2024) ("Perrong also states plausible claims against Chase Data under a vicarious liability theory. . . . The allegations that Chase Data owned

and operated the phone numbers used for the calls and worked closely with its purported clients in placing the calls, give rise to an inference that it had actual authority to act on Chase's clients' behalf."). Nor does it matter that Happy Quote initiated the calls, as the Plaintiff has also pled that she was transferred, on those very same calls, to Quest Health's employees. Quest Health remains liable for Happy Quote's conduct, even *if* Happy Quote was the entity that initiated the calls and then transferred those qualified leads exclusively to Quest Health. Indeed, another court recently denied a motion to dismiss vicarious liability based TCPA claims for this exact reason—because the defendant actually participated in the telemarketing calls at issue, including by speaking directly with the plaintiff during the calls, just as here:

> Plaintiff has made a prima facie showing of an agency relationship based on actual authority. Her Amended Complaint provides specific allegations regarding Mutual of Omaha's ability to control the third party's telemarketing methods…These allegations are similar to those made in other TCPA cases in this Court. *See Hossfeld v. Gov't Emples. Ins. Co.*, 88 F. Supp. 3d 504, 507 (D. Md. 2015) ("Plaintiffs allege that 'in order to accept telemarking call transfers, sellers must tell their telemarketers and lead generators the speed and volume of calls so that its operators do not become overwhelmed.'")

> Additionally, just as in *Hossfeld*, plaintiff has alleged that she received calls from an unidentified third-party telemarketer hired to sell branded products of another company who had control over the telemarketer's practices with respect to selling its products. . . . Plaintiff also alleges that during the "solicitation", Mutual of Omaha's insurance services "were promoted." Moreover, she was then transferred to Eric Chambers, who identified himself as an employee of Mutual of Omaha.

*Jones v. Mutal of Omaha Ins. Co.*, 639 F. Supp. 3d 537, 551 (D. Md. 2022) (cleaned up).

And there, as here, even *if* this Court were to assume, improperly, that Quest Health had nothing to do with initiating the calls Plaintiff received, Quest Health is still vicariously liable for the TCPA violations, thus subjecting it to personal jurisdiction here. This is so because, under the TCPA, "a party may be liable under the TCPA in accordance with tort-related vicarious liability rules," including actual authority, apparent authority, and ratification. *Klein v. Just Energy Group*, No. 14-1050, 2016 U.S. Dist. LEXIS 84447, at *27 (W.D. Pa. June 29, 2016).

B. *The facts pled here support a finding of personal jurisdiction under the traditional analysis without considering vicarious liability.*

There exist two types of personal jurisdiction: general and specific. Specific personal jurisdiction exists when the defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). General personal jurisdiction exists when the defendant's contacts with the forum, whether or not related to the litigation, are "continuous and systematic." *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984).

As a preliminary matter, the Plaintiff does not contest that the complaint, as pled, suggests that the court lacks *general* jurisdiction over Defendant Quest Health. Though Defendant may not subject to *general* personal jurisdiction on the facts pled here, Defendant is unquestionably subject to *specific* personal jurisdiction in Pennsylvania. Generally speaking, a federal court may assert *specific* personal jurisdiction over a nonresident defendant when it commits "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Furthermore, the plaintiff's claims "must arise out of or relate to the" defendant's contacts with the forum. *Helicopteros*, 466 U.S. at 414. To demonstrate purposeful availment, the plaintiff need only show (1) that the defendant conducted some activity in the forum so as to subject it to personal jurisdiction there and (2) that the constitutional notions of fair play and substantial justice are satisfied such as to be consistent with due process requirements. *Burger King*, 471 U.S. 462, 464 (1985). This Court exercises personal jurisdiction over a nonresident defendant of the forum state to the maximum extent authorized by the law of the forum, usually as dictated by the state's long arm statute. FED R. CIV. P. 4(e), (k)(1).

The first subpart of demonstrating purposeful availment is satisfied here. The Pennsylvania long-arm statute reflects a purpose to assert jurisdiction over a nonresident defendant to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment. *Pennzoil Prod. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 201 (3d Cir. 1998). Significantly, the Third Circuit has found purposeful availment coterminous with the limits of the Due Process Clause under three measures relevant to the case at bar. First, Defendant Quest Health has transacted business in Pennsylvania, including by having two employees, including its Vice President of Sales, Kevin Withers, in Pennsylvania, employees with specific control over the exact conduct alleged here: illegal telephone sales. 42 PA. CONS. STAT. § 5322(a)(1)(ii), (iii), (iv). Moreover, under existing TCPA-specific case law, as will be addressed below, the Defendant caused harm in Pennsylvania both by its acts and omissions within Pennsylvania (such as by directing the calls and doing business with and to Pennsylvania area codes as well as using Pennsylvania area codes) and outside Pennsylvania (such as by engaging in business with Happy Quote and knowingly ratifying its illegal conduct). 42 PA. CONS. STAT. § 5322(a)(3), (4).

To allow Defendant to escape liability at the pleadings stage on jurisdictional grounds for actions it allegedly did not commit would take a hatchet the TCPA and the Supreme Court's recent decision in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.* 141 S. Ct. 1017 (2021). In *Ford*, a Montana resident passed away as a result of an accident the plaintiff claimed to be a result of Ford's negligence. *Id. at 1023*. Ford moved to dismiss based on a lack of personal jurisdiction. *Id.* Although it correctly denied general jurisdiction because it was headquartered in Michigan and was incorporated in Delaware, it also denied specific jurisdiction because the car was assembled in Kentucky, sold by a Ford dealer in Washington, then sold by third parties, not Ford, in Oregon, and then to the Montana resident. *Id.* Ford argued, as Defendant does here, that

a break in the *causational* chain, such as allegedly not having placed the call itself or itself having sold the car to the injured party, also broke the *jurisdictional* chain. *Id.* at 1024.

Not so. The Supreme Court rejected the same causation-only approach proffered by both Ford and Defendant. In so doing, it clarified that an alleged break in the chain of *causation*, such as (allegedly) not having placed the calls at issue here, akin to not having sold the car at issue into Montana, does *not* break the chain of *jurisdiction*, which is subject to its own analysis, *irrespective* of the causational elements of the case. Defendant, like Ford, cannot deny that it stood ready to provide its services to Pennsylvania residents and to benefit their own business. *Cf. id.* at 1029. Nor can the Defendant deny that it did not know that it was dealing with Pennsylvania and that it would be subject to suit here if, for example, Quest Health was negligent and mailed an incorrect or defective diabetic meter into Pennsylvania. Because the Defendant is unquestionably subject to specific personal jurisdiction here for selling its products, the Defendant is also subject to specific personal jurisdiction because of related marketing conduct, for which it has also hired Pennsylvania employees.

And nothing about the exercise of jurisdiction against the Defendant here would offend traditional notions of fair play and substantial justice or at all be inconsistent with constitutional due process. The crux of the constitutional "due process analysis" is "foreseeability," "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit. *Id.* "When a corporation

9

purposefully avails itself of the privilege of conducting activities within the forum State, it has clear notice that it is subject to suit there." *Id.* (cleaned up).

There can be no doubt that Defendant stood ready to serve a market for its goods and services to Pennsylvania, including by stationing its Vice President of Sales in Philadelphia and a Sales Representative in Whitehall. (Exhibits B, C). And the Plaintiff's case arises out of sales advertising for the sale of the very same business, goods, and services that the Defendant itself sells. Indeed, the Supreme Court has upheld on numerous occasions the imposition of even *general* personal jurisdiction on a company when a company stations a corporate officer, such as its Vice President of Sales, in the forum state, Pennsylvania. *Pennsylvania Lumbermen's Mut. Fire Ins. Co. v. Meyer*, 197 U.S. 407, 413 (1905); *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Min. & Mill. Co.*, 243 U.S. 93, 95 (1917); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 129 (2023). And, putting aside the fact that Defendant employs at least two employees, including a corporate officer, in a sales-related capacity in Pennsylvania, the circumstances of the calls themselves demonstrate purposeful availment and demonstrate that the Plaintiff has suffered an injury in Pennsylvania arising out of a tort committed in Pennsylvania. The Plaintiff sues Quest Health because of *telemarketing conduct* directed at Pennsylvania, for which it is either directly or vicariously liable, as will be described below.

*C. TCPA-specific caselaw also supports the exercise of jurisdiction here.*

District Courts throughout the United States, including this Court, have agreed in the TCPA context and have held that *identical* and even more limited allegations are sufficient to give rise to the inference that an "injury" occurs in the state with a particular area code when a call is received there, let alone when the Defendant (or its agent) *calls using* such an area code. *Shelton v. Nat'l Gas & Elec., LLC*, No. 17-4063, 2019 WL 1506378, at *7 (E.D. Pa. Apr. 5, 2019). Defendant has cited to *no* authority holding that there is no personal jurisdiction in the

state where a recipient receives a call deliberately directed to that recipient's in-state phone number, even if the call was initiated by a third party. *Newell*, 2020 WL 12770854 at *2. This is for good reason, because no such cases exist. *Every court* to consider the issue has held that there is personal jurisdiction against individuals who place such calls. *Id.*

In TCPA cases, courts find that specific personal jurisdiction exists when a defendant, or their agent, sends a message into the forum state by targeting a phone number with an area code that is associated with that forum. *See, e.g.*, *Abramson*, 2018 WL 6617819, at * 4 ("Agentra purposefully aimed its conduct at Pennsylvania by contacting directly Abramson's Pennsylvania mobile and residential telephone numbers."); *Abramson v. CWS Apt. Homes, LLC*, No. 16-426, 2016 U.S. Dist. LEXIS 146627, at *6 (W.D. Pa. Oct. 24, 2016) (holding allegations that defendant targeted Pennsylvania area codes sufficient); *Baker v. Carribean Cruise Line, Inc.*, No. CV 1308246-PCT-PGR, 2014 U.S. Dist. LEXIS 28960, 2014 WL 880634, at *2 (D. Ariz. Mar. 6, 2014) (holdings as sufficient for personal jurisdiction the allegation that "Defendant made calls to Plaintiff's Arizona [cell phone] number and the fact that those calls are the basis for Plaintiff's claims.").

Defendant's argument for why there exists no specific personal jurisdiction rests entirely on the faulty premise that the Defendant did not directly place any of the calls and therefore did not direct its conduct into Pennsylvania. A nearly identical argument to this one was summarily rejected recently in *Ackerman v. Fuego Leads, LLC*, No. 4:23-CV-61, 2024 WL 2136281, at *2 (E.D. Va. May 13, 2024) (holding defendant was subject to specific personal jurisdiction in Virginia when it authorized *a third party* to send calls into Virginia). By directing calls using a spoofed Pennsylvania phone number to a Pennsylvania phone number, including *by the Defendant's own agent asking if the Plaintiff was in Pennsylvania* and then transferring the

Plaintiff to its shipping department to *send goods to Pennsylvania*, and attempting to bill Pennsylvania Medicare, Defendant has purposely availed itself of Pennsylvania and its laws. *See Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction." (cleaned up)).

For what it's worth, this conduct further demonstrates that the exercise of jurisdiction here hardly runs contrary to traditional notions of fair play and substantial justice. *Newell*, 2020 WL 12770854 at *2. As in that case, as will be addressed in more detail in the vicarious liability analysis below, Quest Health contractually authorized its vendor, Happy Quote, to make calls *without any geographic restrictions*. *Id.* With respect to the fair play analysis, "when minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987). Plaintiff clearly has an interest in obtaining relief under the TCPA, and Pennsylvania has an interest in protecting telephone numbers associated with its particular forum. *Shelton*, 2019 U.S. Dist. LEXIS 59235, at *24; *Newell*, 2020 WL 12770854 at *2.

Plaintiff has alleged facts which, if true, unquestionably give rise to the exercise of specific personal jurisdiction in Pennsylvania with respect to the illegal calls complained of. The Defendant's entire motion is premised on a problem of its own devising that cries out for discovery to better flesh out who did what. Defendant cannot now claim that the way it allegedly structured its business should mean that it wins because the Plaintiff has failed to plead sufficient facts such as to demonstrate the minutiae of direct or vicarious liability at the pleadings stage. Those questions, including the questionable nature of the relationship between Happy Quote and

Quest Health as it pertains to telemarketing calls, ought to be fleshed out in discovery, not least of which because Quest Health apparently actually knew of the Pennsylvania connection by *the very own questions* its employees asked on the calls.

This Court should reject Quest Health's attempt to escape liability through corporate sophistry which ignores the sufficient facts pled in the Plaintiff's complaint demonstrating that Quest Health is liable for the conduct alleged either directly or on any one of the three commonly accepted principals of agency. Not only has Plaintiff alleged that she received a call to her Pennsylvania number, but also that Quest Health's employees, including shipping employees, knew they were dealing with a Pennsylvania phone number. A defendant that has accepted the privileges of directing business at the forum state has also accepted the burden of appearing before its courts, even if they have never physically entered the forum state. *Burger King*, 471 U.S. at 476. Here, the plaintiff need only make out a *prima facie* case of personal jurisdiction and he has unquestionably done so under the wealth of TCPA-specific case law holding the same.

In the event this Court remains unsatisfied based on this overwhelming evidence, the Court should order jurisdictional discovery. The purpose of jurisdictional discovery is to ascertain the truth of the allegations or facts underlying the assertion of personal jurisdiction. *Toys "R" Us*, 318 F. 3d at 456. Because jurisdictional discovery is often authorized in TCPA cases where questions of vicarious or direct liability and the defendants' involvement is at issue, this Court should permit the same here. *See, e.g.*, *Goodell v. Van Tuyl Grp. LLC*, No. CV-20-01657-PHX-JJT, 2021 U.S. Dist. LEXIS 181193, at *14 (D. Ariz. Sep. 22, 2021); *JT's Frames, Inc. v. Casares*, N.D. Ill. No. 16-cv-2504, 2018 U.S. Dist. LEXIS 23565, at *15-17 (Feb. 12, 2018) (allowing jurisdictional discovery in a TCPA case as to personal jurisdiction where defendants submitted declarations denying any involvement in the fax at issue to "explore

Defendants' involvement (if any) with the Fax that forms the basis of Plaintiff's [complaint.]"). This discovery should also include discovery into Quest Health's direct or vicarious liability for any of Happy Quote's conduct. *See, e.g.*, *Toys "R" Us*, 318 F. 3d at 456.

> D. *Quest Health is vicariously liable for Happy Quote's conduct under any one of the three principals of agency under the very terms of the contract it attached.*

Finally, Defendant's vicarious liability arguments can be summarily disposed of. As described above, the Court's analysis must begin and end with whether or not the Plaintiff has plausibly alleged the Defendant's involvement in the calls. She has done so by investigating them and determining that they led to Quest Health as part of the *exclusive* lead generation arrangement Quest Health hired Happy Quote to conduct on its behalf, as evidenced by the contract Quest Health attached to its motion. Requiring a putative TCPA plaintiff to allege more as to the precise nature of agency would eviscerate the TCPA's protection and would simply allow defendants to run rampant with all manner of anonymous and unidentified calls. The Defendant's standard provides a perverse incentive for a caller to conceal their identity by making it impossible for any plaintiff to prove a claim against the defendant at the pleadings stage based on a lack of information and evidence.

But even if this Court were to dive into a vicarious liability analysis, Quest Health would be liable under theories of actual authority, apparent authority, and ratification. These vicarious liability principles apply to a company who participated in or authorized another entity, like Happy Quote, to perform the violative conduct, even when the seller did not directly commit the violative conduct or even place the calls at issue. *E.g.*, *Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2022 WL 4088205, at *6–7 (W.D. Tex. Sept. 6, 2022) (imposing vicarious personal liability on an individual insurance agent who was responsible for writing an insurance policy based on an illegal call initiated by an unrelated, unnamed caller).

14

"[A] party may be liable under the TCPA in accordance with tort-related vicarious liability rules," including actual authority, apparent authority, and ratification principles. *Klein v. Just Energy Grp., Inc*., No. CV 14-1050, 2016 WL 3539137, at *9 (W.D. Pa. June 29, 2016). A plaintiff is required to allege a sufficient basis for any "one of the common law agency theories." *Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, at *17-21 (D.N.J. Nov. 20, 2018).  The existence of an agency relationship is normally one for the trier of fact to decide. *Zeno v. Ford Motor Co.*, 480 F. Supp. 2d 825, 846 (W.D. Pa. 2007). Nor is the contract's language dispositive, as the Third Circuit has observed that a written contract is "not determinative of the matter, for it is the actual practice between the parties that is crucial." *Jones v. Century Oil U.S.A., Inc.*, 957 F.2d 84, 87 (3d Cir. 1992).

 For this reason, "[A] plaintiff is not required to plead all of its evidence in the complaint in order to plausibly allege agency." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 996 (N.D. Ill. 2016). A plaintiff must only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sep. 7, 2016). And a 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of [agency] relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46.

For TCPA claims specifically, there is a low bar to pleading vicarious liability, as a plaintiff is *not expected* to allege "facts suggesting that" the defendant: (1) "instructed" the putative agent "to make the call to" the plaintiff, (2) "had any authority over the time, means and manner of" the putative agent's solicitations, or (3) "had the ability to issue instructions … on these subjects."  *Dolemba*, 213 F. Supp. 3d at 997 ("But Farmers does not suggest how Dolemba

15

could reasonably be expected to know those facts at this stage in the litigation. Indeed, it is likely that all of the documents and information that establish (or refute) the details of the agency relationship between Farmers and the Lombardi Agency are exclusively within the Defendants' custody and control."); *see Cunningham v. Rapid Response Monit. Servs.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) ("Cunningham has investigated the parties extensively, but inevitably some aspects of their relationships will only come to light in discovery."). Thus, for a TCPA claim, a plaintiff sufficiently pleads that a defendant directed an agent's calls by alleging facts giving rise to an inference that the defendant was "involved" in the "sales practices and marketing procedures." *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 922-923 (C.D. Ill. 2017); *Dolemba*, 213 F. Supp. 3d at 997 ("Of course, these facts may not be sufficient to prove any theory of vicarious liability.  They are more than sufficient, however, to entitle Dolemba to further discovery.").

And here, the Plaintiff has pled sufficient facts to infer an agency relationship, or at the very least, facts sufficient to permit discovery into any vicarious liability issues. Those allegations are based, in large part, on the contract the Defendant itself has attached to its motion, as well as the very experience of the Plaintiff herself. The Plaintiff's Amended Complaint contains various allegations, all of which demonstrate the hallmarks of an agency relationship, control, under any one of these three generally-accepted theories. The agency relationship between Quest and Happy Quote was memorialized in a lead generation agreement that contained many of the hallmarks of an agency relationship. (Am. Compl. ¶ 46). Some of those requirements, and demonstration of how they show control, are reproduced on the following page:

| Quote From Contract | How Control is Demonstrated |
|---|---|
| "Client has the right to reject any Lead pursuant to Section 4.2 of the Agreement if such Lead does not meet the following requirements or as otherwise set forth in Section 4.2 of the Agreement: To be determined in subsequent Insertion Orders." | Quest Health has unilateral authority to reject leads that don't meet criteria to be defined later in insertion orders, which gives Quest Health significant control over the quality and acceptability of Happy Quote's core deliverable (Qualified Leads), effectively setting the standard Happy Quote must meet. |
| "If Happy Quote submits leads to Client that Client believes do not meet the approved leads qualification criteria, Client will send such leads along with their grounds for rejection to Happy Quote. These proposed rejections will be processed on weekly basis and must be submitted no later than 2 days after the close of the calendar week." | Quest Health can review and challenge the suitability of leads weekly, imposing a process where Happy Quote must respond to and potentially adjust its conduct based on Quest Health's judgment. This creates an ongoing mechanism for Quest Health to enforce compliance with its expectations. |
| "Client shall be entitled to offset any amounts owed pursuant to this Section from unpaid or future Lead Fees." | If Happy Quote owes indemnification, Quest Health can deduct these amounts from payments owed to Happy Quote. This financial control mechanism allows Quest Health to penalize Happy Quote without immediate out-of-pocket costs, reinforcing compliance. |
| "Provide Happy Quote with data regarding the performance of Happy Quote Leads including Cost Per Acquisition in a timely manner upon request." | By controlling the flow of performance data, Quest Health can influence Happy Quote's ability to assess and improve lead quality. The phrase "upon request" suggests Happy Quote depends on Quest Health's discretion to share this feedback, giving Quest Health leverage over Happy Quote's operational adjustments. |
| "Neither Happy Quote nor Client may assign or transfer this Agreement… without the written consent of the non-assigning party, which consent shall not be unreasonably withheld, conditioned, or delayed." | Quest Health's veto power over any assignment by Happy Quote of its obligations ensures it retains control over who performs the lead generation services, preventing Happy Quote from delegating obligations to any entity. |
| "The selection of counsel, the conduct of the defense of any lawsuit… and any settlement shall solely be within the indemnifying Party's control, provided that the indemnified Party shall have the right to participate… at its expense." | When Happy Quote indemnifies Quest Health (under 7.1), presumably as it is in this case, it can participate in the defense process, exerting influence over how Happy Quote handles claims. This oversight ensures Happy Quote's actions align with Quest Health's interests, even if Happy Quote *technically* controls the defense. |

Contract, Def's. Exhibit A, ECF 19-2, *passim.*

Specifically, the essence of the agreement was that Happy Quote agreed to "deliver Qualified Leads" *exclusively* to Quest, and Quest dictated the criteria for the leads it would purchase from Happy Quote. (Am. Compl. ¶ 48). Moreover, Quest, not Happy Quote, controlled Happy Quote's day-to-day activities by providing criteria for leads it would accept, as well as allowing Quest to accept or reject leads at its sole discretion. (Am. Compl. ¶ 48, 50). Like in *Newell*, the contract contained no geographic limitations, nor did it specifically prevent Happy Quote from calling Pennsylvania telephone numbers. *Newell*, 2020 WL 12770854, at *2. Besides controlling the geographic targeting of the calling (or, perhaps more accurately, blessing indiscriminate calling), Quest also controlled the content of Happy Quote's marketing, including by requiring Happy Quote to comply with the TCPA, requiring Happy Quote to "avoid deceptive, misleading or unethical representations or practices," as well as requiring Happy Quote to abide by Quest's criteria in creating website content, including in the process of driving telemarketing calls. (Am. Compl. ¶ 41, 43, 54).

Judge Savage's recent decision in *Havassy v. Keller Williams Realty, Inc.*, is particularly noteworthy because, just as here, the defendant attempted to argue the lack personal jurisdiction couched in the denial of an agency relationship. As Judge Savage observed in *Havassy*:

> WRI denies any direct connection between it and Hewitt and Houston, arguing that they work with an independent market center. KWRI does not require independent realtors to participate in any KWRI training. KWRI claims Hewitt and Houston, as independent realtors, communicate with customers for their own benefit. These contentions are belied by the control KWRI dictates in the licensing agreement.

> That KWRI employees did not make the phone calls does not mean KWRI had no connection to them. Houston and Hewitt, as prescribed in KWRI's guidelines, used KWRI's name when they called potential customers and identified themselves as associated with "Keller Williams." KWRI controls all advertising and marketing that the Keller Williams Bethlehem office and its agents, Houston and Hewitt, perform using KWRI's name. Using the Keller Williams logo and the Keller Williams domain in their email addresses enhances KWRI's brand and consequently its profits. . . . Hence, we conclude that KWRI's conduct is related to Havassy's claims.

No. CV 21-4608, 2024 WL 1640984, at *6–*7 (E.D. Pa. Apr. 16, 2024) (cleaned up). So too here, where Happy Quote was *exclusively* calling to market Quest Health's products and services for Quest Health's benefit, according to Quest Health's own guidelines, and then transferred the calls to Quest Health employees, as outlined above. A litany of other courts has agreed and applied nearly identical reasoning in applying vicarious liability to circumstances similar to those here, where one party's goods are sold through a lead generator sales process. *See, e.g.*, *Cunningham v. Wallace & Graham*, No. 1:24-CV-00221, 2024 WL 4826798, at *3 (M.D.N.C. Nov. 19, 2024) ("The complaint alleges that Sokolove partnered with Wallace & Graham to solicit Camp Lejeune claimants through telemarketing efforts and that Wallace & Graham and Rhine Law Firm were both signatories of the proposed retainer agreement sent to Cunningham after the calls. These allegations, which must be accepted as true, provide a sufficient basis for 'draw[ing] the reasonable inference that the defendant[s] [are] liable for the misconduct alleged.'"); *Bumpus v. Realogy Brokerage Grp. LLC*, No. 3:19-CV-03309-JD, 2022 WL 867256, at *7 (N.D. Cal. Mar. 23, 2022) (certifying TCPA class against brokerage for actions of purportedly independent agents); *Chinitz v. Intero Real Est. Servs.*, No. 18-CV-05623-BLF, 2021 WL 1375837, at *5 (N.D. Cal. Apr. 12, 2021) ("The Court finds that Defendant is vicariously liable for calls made by its corporate sales associates and agents based on apparent authority."); *McMorrow v. Core Properties, LLC*, No. 4:23-CV-00126-JAR, 2023 WL 8697795, at *13 (E.D. Mo. Dec. 15, 2023) ("[T]he Court finds that Plaintiff has established that Core Properties provided apparent authority to 1000 CAD to send the text messages to Plaintiff."); *Hayhurst v. Keller Williams Realty, Inc.*, No. 1:19CV657, 2020 WL 4208046, at *6 (M.D.N.C. July 22, 2020) ("At this stage of the proceedings, Hayhurst has sufficiently alleged an agency relationship between Keller Williams and the individuals who called him.").

19

The aforementioned facts support the exercise of vicarious liability under actual authority, apparent authority, and ratification theories. An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006); see also *Krakauer*, 925 F.3d at 659-660 (stating the same and citing the Restatement). "Once such a relationship is formed, 'traditional vicarious liability rules ordinarily make principals . . . vicariously liable for acts of their agents . . . in the scope of their authority.'" *Id.* at 660 (*quoting Meyer v. Holley*, 537 U.S. 280, 285-86, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003)). "An essential element of agency is the principal's right to control the agent's actions", but this concept of control "embraces a wide spectrum of meanings", including "what the agent shall and shall not do, in specific or general terms." Restatement (Third) of Agency § 1.01 cmt f. "A principal's control over an agent will as a practical matter be incomplete because no agent is an automaton who mindlessly but perfectly executes commands." *Id.*

**Actual Authority**

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01. Actual authority may be given expressly—such as when the principal states "in very specific or detailed language" how an agent is to act—or impliedly—such as when an agent acts "in a manner in which [the] agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." *Hayhurst v. Keller Williams Realty, Inc.*, 2020

WL 4208046 at *5 (denying motion to dismiss in TCPA vicarious liability case); see

*Cunningham*, 251 F. Supp. 3d at 1199 ("The question of whether implied authority may have

existed would require the Court to know more about the course of the parties' dealings and the

generally expected course of business ....").

Actual agency "does not require the principal to specify the singular acts for which her or

her authority exists as long as the acts are incidental to or reasonably necessary to accomplish

what is authorized." *Harrington v. Roundpoint Mortg. Servicing Corp.*, 2017 U.S. Dist. LEXIS

55023, at *21 (M.D. Fla. Apr. 10, 2017). "The concept of scope of authority is broad. An agent

has authority to act to further the principal's objectives, as the agent reasonably understands the

principal's manifestations and objectives. The principal is liable for the acts of the agent to

further the principal's purposes unless the agent acts entirely for the agent's benefit only."

*United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 923 (C.D. Ill. 2017) (citing

Restatement (Third) of Agency § 2.02(1)). Thus, for a TCPA claim, a plaintiff sufficiently pleads

that a defendant actual directed an agent's calls by alleging facts giving rise to an *inference* that

the defendant was "involved" in the "sales practices and marketing procedures." *United States*,

256 F. Supp. at 922-923; *Dolemba*, 213 F. Supp. 3d at 997 ("Of course, these facts may not be

sufficient to prove any theory of vicarious liability. They are more than sufficient, however, to

entitle Dolemba to further discovery.").

Here, the Plaintiff has more than adequately pled facts giving rise to such an inference,

including by the aforementioned contractual terms themselves, as well as the Plaintiff's own

experiences. As the Restatement itself cautions, the critical concept of *control* in an agency

relationship is not so narrow as to be limited to the express terms of agency in the parties'

agreement or even the express scope of authority but extends to encompass direction of "what

the agent shall and shall not do, in specific or general terms." Restatement (Third) of Agency §
1.01 cmt f.; *Jones*, 957 F.2d at 87. The contract at issue here encompasses many requirements
and obligations, outlined above, including those related to the very conduct at issue here, which
give rise to the inference of an agency relationship on actual authority. The contract at issue
oozes with language reflecting the essential element of control for actual authority, including
Quest Health agreeing to provide Happy Quote with data, and Happy Quote agreeing to
exclusively market Quest Health's services for it, in line with all applicable regulations. Thus,
Quest Health's general instruction for Happy Quote to "exclusively" generate "Approved Leads"
for it by telephone, that it would then fulfill resulting from such Leads, which Quest Health
retained a right of control in the form of refusal, as well as imposing other compliance and
fulfilment requirements above, suffices to establish actual authority at the pleadings stage.

Indeed, the contract itself permits Happy Quote to only submit "qualified leads" and
"Approved Leads" to Quest Health, demonstrating that Quest Health, and not Happy Quote,
dictated the qualification criteria. That Quest Health attempts to distinguish this requirement as
one of *control* over *acceptance*, as opposed to content, still does not detract from the essential
element of *control*, which remains. So too does the element of control pervade the other
provisions outlined above, including with respect to lead quality, contractual obligations, and
indemnification. Thus, as the authorities above counsel, and applying these firmly-rooted legal
principals here, Plaintiff is *not* required to plead that Quest Health provided Happy Quote with
scripts or expressly stated in "specific or detailed language" how Happy Quote was to act,
*Hayhurst*, 2020 WL 4208046 at *7, nor is the language of the contract disclaiming agency
dispositive, *Jones*, 957 F.2d at 87. Rather, all the Plaintiff was required to show was some degree
of control over involvement in Happy Quote's sales and marketing practices over the telephone,

which Quest Health retained by *controlling*, by its own admission, whether it would accept the leads generated. *United States*, 256 F. Supp. at 922-923; *Dolemba*, 213 F. Supp. 3d at 997.

It is on these points that the authorities cited by the Defendant are distinguishable. In arguing there is no actual authority and no agency under such a theory, the Defendant conflates an *agency relationship* analysis one with an *independent contractor/employee* analysis; they are not the same thing, and the former, more applicable standard, requires a more relaxed test than the latter. The remainder of cases cited by the Defendant are therefore distinguishable, not least of which because *they do not even address the issue of agency*, but rather address the issue of whether parties are *employees* or *independent contractors*, as in *Woolfolk*, *Holliday*, and *Hamilton*. The two are not coextensive with an agency analysis, as the independent contractor, principal-agent, and master-servant relationships are distinct; the status of an agent and independent contractor are not mutually exclusive. *Castle Cheese, Inc. v. MS Produce, Inc.*, No. CIV.A 04-878, 2008 WL 4372856, at *6, *7 (W.D. Pa. Sept. 19, 2008). An independent contractor can nevertheless be an agent of a principal while retaining its status as an independent contractor and not as an employee. *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F. Supp. 2d 811, 838 (S.D. Tex. 2008) ("Under a contract, a party may be both an agent and an independent contractor."). As such, the Plaintiff has plainly pled a claim for actual authority.

**Apparent Authority and Ratification**

Apparent authority "arises when a third-party reasonably believes that the [] agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations." *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011). Apparent authority can exist even where, unlike here, a principal does not communicate directly with a consumer. *See Hayhurst*, 2020 WL 4208046 at *8 ("Although

23

Keller Williams is not alleged to have made any statements directly to Hayhurst, it is not required to do so. Rather, its manifestations must be 'traceable' to it even if it did not make them directly to Hayhurst. And, its manifestations 'may take many forms'.").

"Ratification occurs when a principal knowingly chooses to accept the benefits of unauthorized actions an agent takes on the principal's behalf." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016); Restatement (Third) of Agency § 4.01(1) (2006) cmt. d. ("Ratification does not require a pre-existing formal agency relationship."). "[R]atification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act. It is necessary that the actor have acted or purported to act on behalf of the ratifier." Restatement (Third) of Agency § 4.01 cmt. b; *see Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019) (citing the Restatement and holding in a TCPA action that "ratification may create an agency relationship when none existed before the acts are 'done by an actor … who is not an agent but pretends to be.'"). To demonstrate prospective ratification, a plaintiff must show that a principal had full knowledge of all the facts, *or* was willfully ignorant of those facts, and manifested an intention to ratify the act in question, *or* that an agent acted for a principal's benefit and the principal "fail[ed] to object or repudiate an action." *Henderson*, 918 F.3d at 1074-75; *Aranda*, 179 F. Supp. 3d at 831.

Here, Plaintiff sufficiently pleads Defendants' vicarious liability predicated on apparent authority and ratification theories based on the same allegations supporting an actual authority theory. Specifically, with regard to *apparent* authority, it is and was reasonable for Plaintiff to believe that Quest Health authorized Happy Quote to send calls on its behalf because after the Plaintiff spoke with Happy Quote's unnamed and anonymous robot, she then spoke with Quest Health's representatives in the sales and shipping departments. *Cf. Jones*, 639 F. Supp. 3d at 552

(imposing vicarious liability when the transferring call center was an "unidentified third-party telemarketer hired to sell branded products of another company"). Here, Quest Health knowingly accepted Happy Quote's call transfer, fully knowing both (1) that the call was transferred *from a robot*, in blatant violation of the TCPA, (2) that used a generic alias, and (3) that the Plaintiff had a Pennsylvania area code, as the Quest Health employees' questions confirmed.

Critically, as is evident from the Plaintiff's experiences on the calls, as well as the text of the contract itself, the leads Happy Quote exclusively made for Quest Health were to be submitted "by Happy Quote to [Quest Health] via a method mutually agreed upon between Happy Quote and [Quest Health]." That is to say, Happy Quote was able to *directly submit* qualified leads it generated into Quest Health's very own internal computer and sales systems so that Quest Health could fulfill those leads. As the FCC and numerous courts have held, the provision of direct data entry into a principal's computer system is sufficient for a finding of agency. *In re Dish*, 28 F.C.C. Rcd. at 6592. ("For example, apparent authority may be supported by evidence that the seller allows the . . . outside sales entity to enter consumer information into the seller's sales or customer systems."); *Dickson v. Direct Energy, LP*, No. 5:18-CV-00182-JRA, 2024 WL 4416856, at *9-10 (N.D. Ohio Oct. 4, 2024); *McMorrow v. Core Props., LLC*, No. 4:23-CV-00126-JAR, 2023 WL 8697795, at *13 (E.D. Mo. Dec. 15, 2023) (granting summary judgment *to plaintiff* on vicarious liability issue when plaintiff established that defendant authorized marketer to enter information into a customer information system); *Hossfeld v. DIRECTV, LLC*, No. 222CV05339JLSMAA, 2023 WL 3549742, at *6 (C.D. Cal. Mar. 31, 2023) (similarly denying motion to dismiss).

Similarly, with regard to ratification, Defendant knowingly accepted the benefits of the illegal calls made to Plaintiff that *it knew was made using a robot*. Given that the parties'

contract stated that Quest Health would accept only "qualified" leads meeting its criteria, it follows that illegal calls placed with a robot would have satisfied Quest Health's criteria. Otherwise, the call would not have been transferred to Quest Health and Quest Health would have rejected it. For what it's worth, this acceptance also shows that Quest Health had knowledge of the fact that Happy Quote was transferring it calls procured through illegal robocalls as far back as the calls themselves, but yet did nothing. And Quest Health still has not confirmed whether or not it continues to work with Happy Quote, since it presumably still does.

As a result, Quest Health was directly involved in the calls by getting *exactly* what was intended from them—the opportunity for Quest Health to promote and sell its diabetic meters to potential new customers obtained through robocalls, like the Plaintiff. *See, e.g.*, *Aranda v. Caribbean Cruise Line, Inc.*, 179 F.Supp. 3d 817, 833 (N.D. Ill. 2016) (sellers ratified telemarketers' conduct by accepting the benefits of the unlawful calls in TCPA case); *Keim v. ADF Midatlantic, LLC,* 2015 WL 11713593, at *8 (S.D. Fl. 2015) (allegations sufficient to state a claim where seller accepted the benefits of the conduct by having text messages sent on its behalf to phone numbers obtained on its behalf); *Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, 2018 U.S. Dist. LEXIS 132078 (N.D. Cal. 2018) (a reasonable jury could find defendant liable on ratification theory where "Alarm.com knew of Alliance's allegedly illegal telemarketing conduct and accepted the benefits therefrom"). As a result, Plaintiff sufficiently alleges Defendant's vicarious liability based on apparent authority and ratification based on manifestations traceable to and benefits derived directly by both Defendants, including in the course of Plaintiff's investigation.

**IV.    CONCLUSION**

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, to the extent that the Court finds that additional questions remain, it should permit the Plaintiff to amend to correct the deficiencies or permit jurisdictional discovery, as necessary.

RESPECTFULLY SUBMITTED AND DATED this April 9, 2025.

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date.

Dated: April 9, 2025

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com